AO 91 (Rev. 11/11)   Criminal Complaint

| LODGED | |
|---|---|
| CLERK, U.S. DISTRICT COURT | |
| 11/05/2021 | |
| CENTRAL DISTRICT OF CALIFORNIA | |
| BY: _____ AP _____ DEPUTY | |

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| FILED | |
|---|---|
| CLERK, U.S. DISTRICT COURT | |
| 11/5/2021 | |
| CENTRAL DISTRICT OF CALIFORNIA | |
| BY: _____ KC _____ DEPUTY | |

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| v. | ) |
| DILLION JONES, | ) Case No. 5:21-mj-00667 |
| | ) |
| | ) |
| | ) |
| | ) |
| _____ *Defendant(s)* | ) |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ July 31, 2021 _____ in the county of _____ San Bernardino _____ in the _____ Central _____ District of _____ California _____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 1951(a); 924(c)(1)(A)(iii); (j)(1); and 2(a) | See attached affidavit |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

_____/S/_____
*Complainant's signature*

ATF Special Agent, Jarret Keegan
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: November 5, 2021

_____
*Judge's signature*

City and state: _____ Riverside, CA _____

Honorable Sheri Pym, U.S. Magistrate Judge
*Printed name and title*

*AUSA:* John A. Balla (x6246)

## I.   **AFFIDAVIT**

I, Jarrett Keegan, being duly sworn, declare and state as follows:

## II.   **PURPOSE OF AFFIDAVIT**

1.   This affidavit is made in support of a criminal complaint and an arrest warrant against Dillion JONES ("JONES") for violations of 18 U.S.C. §§ 1951(a) (Interference with Commerce by Robbery); 924(c)(1)(A)(iii), (j)(1) (Use, Carry, Brandish, and Discharge a Firearm in Furtherance of a Crime of Violence Causing Death); and 2(a) (Aiding and Abetting).

2.   JONES is believed to be the remaining outstanding suspect in a robbery homicide investigation where a three-person armed robbery crew shot and robbed a marijuana dealer.  The two other members of the robbery crew are charged in *United States v. Martrell Patrick Shaw et al.*, ED CR 21-00191-JGB.

3.   The facts set forth in this affidavit are based upon my personal observations; my training and experience; and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

### III.  <u>BACKGROUND OF AGENT</u>

11.  I am a Special Agent ("SA") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") in San Bernardino, California.  I joined ATF in July 2014.  Prior to becoming a SA with the ATF, I was a Federal Air Marshal with the Federal Air Marshal Service for seven years.  During my career in federal law enforcement, I have received extensive training regarding federal criminal law. My education includes a Bachelor's Degree in Aerospace Studies from Embry Riddle Aeronautical University and a Master's Degree in Security Management from American Military University.

12.  As an SA, I have completed training at the ATF National Academy and the Federal Law Enforcement Training Center related to federal firearms and narcotics laws and regulations.  I regularly refer to these laws and regulations during the course of my duties and have written and participated in the execution of numerous search and arrest warrants for violations of these statutes.  During my career in the field, I have participated in the investigation, surveillance, and arrest of numerous prohibited persons in possession of firearms, as well as firearms and narcotics traffickers, and subjects engaged in crimes of violence such as robbery, carjacking, attempted murder, and murder.

### IV.  <u>SUMMARY OF PROBABLE CAUSE</u>

13.  In the early evening hours of July 31, 2021, a homicide occurred in San Bernardino, California.  Responding San Bernardino Police Department ("SBPD") officers found the male

victimlying on the ground just in front of his vehicle suffering from multiple gunshot wounds.  The victim was pronounced deceased just under two hours later.

14.   The victim's vehicle was found to be running with fired cartridge cases ("FCCs")[1] discovered inside and just outside the passenger door of the vehicle.  Officers spoke with a witness who saw two male suspects walking up to the victim's vehicle, with one of the suspects leaning in the front passenger's window and the other standing next to him.  The witness heard two gunshots right before the two suspects fled the victim's vehicle on foot.  High quality surveillance video was recovered which supported the witness's account.

15.   Homicide detectives with the SBPD Homicide Unit conducted further investigation, retrieving additional surveillance video that captured the two suspects fleeing the scene and being picked up by a gold Mercedes sedan.  Detectives noted that one of the two suspects was carrying a large, dark colored duffel bag and that the same suspect appeared to have dropped and picked up something just before entering the Mercedes.

_____

[1] The basic components of a single round of ammunition include the case (aka the brass), the primer, the powder, and the projectile (aka the bullet).  When the firing sequence is initiated inside the firearm, the primer is struck igniting the gunpowder, which results in the buildup of immense pressure inside the case.  The pressure subsequently forces the projectile away from the case and down the firearm's barrel in rapid succession.  The completion of the firing sequence leaves the case intact with an embedded spent primer, identified in the law enforcement community as an FCC.

16.   Homicide detectives interviewed the victim's family, who stated the victim operated a mobile marijuana dispensary. The victim's family stated the victim always carried a 9mm Smith and Wesson pistol for protection, which was originally purchased by the victim's brother.  A search of the victim's vehicle yielded a large amount of suspected marijuana but no firearm, leading homicide detectives to believe the suspects stole the victim's pistol and marijuana.  The search also revealed the victim's phone, which contained Snapchat messages and calls with from the victim's Snapchat account, to an account later identified as belonging to JONES.  Based on the examination of the messages, it appears JONES arranged to meet the victim in front of the school where the victim was killed.

17.   Approximately a week after the homicide, investigators discovered the same gold Mercedes used as the getaway vehicle parked in front of an apartment complex just one block from the scene of the shooting.  SBPD officers conducted surveillance of the Mercedes and saw two male subjects matching the physical characteristics of the suspects entering the apartment closest to the vehicle.  Investigators secured a state search warrant for the Mercedes and the associated apartment.

18.   On August 12, 2021, SBPD officers executed the search warrant at the apartment and detained brothers Martrell and Rontrell Shaw.  Rontrell identified himself as the owner of the gold Mercedes.  During the search of the small apartment, detectives found a loaded, unserialized pistol (or "ghost gun") and ammunition, as well as clothing and a duffel bag which

matched what the suspects were wearing at the time of the homicide.  Officers also found the two phones on Rontrell and inside the apartment.  Officers transported both Martrell and Rontrell to the SBPD station and interviewed them.

19.  During *Mirandized* interviews, both Martrell and Rontrell admitted to being involved in a robbery that resulted in the death of the victim.  Detectives learned that Martrell, Rontrell, and their cousin, JONES, arranged to purchase marijuana from the victim, ordering $1,300 worth of marijuana despite having only approximately $50 or $60 between them.  The suspects arranged to meet the victim in front of Cajon High School (where officers found the victim), just two blocks from Rontrell and Martrell's residence.  Rontrell dropped both Martrell and JONES off near the meeting location, with both Martrell and JONES walking up to the victim's vehicle. According to Martrell, JONES pointed a handgun at the victim and demanded marijuana and other property.  The victim reached for his own handgun in the driver's side door pocket before JONES fired multiple shots at the victim.  Both Martrell and JONES fled the scene with the victim's marijuana, firearm, and cash. The two were picked up by Rontrell a block away, and the three split the marijuana proceeds from the robbery.

20.  Martrell and Rontrell were charged soon after with their roles in the robbery and murder in in *United States v. Martrell Patrick Shaw et al.*, ED CR 21-00191-JGB.  After authoring and acquiring a search warrant for the Snapchat account that was communicating with the victim immediately

before his death, I reviewed the returned material.  I saw geolocation data which showed the account was accessed within meters of Shaw brothers' apartment approximately 30 minutes before the robbery.  Additionally, IP history for the account provided by Snapchat showed the account was logged on to an IP address tied to the Shaw brothers' apartment minutes after the robbery.  Additionally, further IP history for the account showed it was logged in to an IP address tied to JONES's residence in Colton when a password was changed by the user on March 17, 2021.  I also reviewed the videos provided by Snapchat which were associated with the account.  Many of those videos were filmed from a "selfie" perspective and featured a subject I recognized to be JONES, matching tattoos from body camera footage taken of JONES during prior law enforcement contacts.

21.  Finally, I received a laboratory report from the San Bernardino County Sheriff's Department which compared latent prints recovered from the victim's vehicle.  I learned fingerprint examiners had verified that prints belonging to JONES were lifted from both the hood and the interior window of the victim's vehicle.

## V.   STATEMENT OF PROBABLE CAUSE

22.  The following is based on my review of law enforcement reports and video evidence, as well as conversations with other law enforcement officers including SBPD Homicide Detective A. Reyna, the case agent on the investigation.  The following is a summary of the investigation:

### A.    Robbery of Marijuana Dealer D.M. on July 31, 2021

23.    On July 31, 2021, at approximately 7:00 p.m.,
dispatchers with the San Bernardino Police Department received
calls reporting shots fired in the area of 1200 W. Hill Dr. in
San Bernardino, California.  The reporting party ("RP") told
dispatchers an unknown male subject (later identified as D.M. or
"the victim") approached the RP's residence and was visibly
bleeding, just after the RP heard gunshots in the area.

24.    SBPD patrol officers responded to the scene and found
the victim's vehicle, a black 2003 BMW 3-series displaying
California license plate 5CWD542, parked facing west on the
north curb line of W. Hill Dr., just west of N. Mountain Dr.
The victim's vehicle was parked directly south of the loading
zone area near the southeast corner of Cajon High School.
Officers noted the victim's vehicle was running, with the driver
side door ajar.  Officers found the victim near his vehicle,
laying down on the grass on the north sidewalk of W. Hill Dr.
The victim was found to have suffered apparent gunshot wounds to
the neck and the left shoulder.  Medical personnel responded and
transported the victim to San Bernardino Community Hospital
where the victim succumbed to his injuries and passed away
approximately 90 minutes after the shooting.

25.    Homicide detectives arrived on scene and searched the
victim's BMW for evidence.  Detectives recovered a .40 caliber
FCC from the front passenger seat of the BMW and a second .40
caliber FCC from the ground directly north of the passenger door
near the sidewalk.  A bullet fragment was also collected from

7

the floorboard directly behind the driver's seat.  Detectives further processed the vehicle and discovered the victim's iPhone inside the vehicle, which was functioning and receiving calls. Finally, inside the BMW, officers found Ziploc packaging, a scale, and a duffle bag containing an additional scale with a large quantity of marijuana.  Detectives did not find a firearm inside the vehicle.

**B.   Witness Interviews**

26.   Officers conducted an area canvas and interviewed multiple witnesses, including witness #1 (further identified as "witness #1").[2]  Witness #1 stated he/she was walking their dog outside when he/she observed two black male subjects, described as "teens" walk up to the victim's vehicle.  Witness #1 stated he/she watched as the two subjects conversed with the victim for several seconds.  Witness #1 stated as he/she began to walk inside, he/she heard what they described as "two pops," then looked to see the two subjects running westbound away from the victim's vehicle.  Approximately two minutes later, witness #1 stated he/she saw the victim come to their front door asking for help.  Officers recovered video surveillance from a camera at witness #1's residence.

27.   Officers encountered witness #2, who resided approximately 50 yards west of where the shooting occurred.

---

[2] The true identities of the witnesses referred to in this affidavit and the exact addresses where the shooting occurred are known to law enforcement.  However, to maintain the integrity of the investigation and to prevent witness/victim intimidation and to protect the privacy of the witnesses, I have not included full legal names or addresses in this affidavit.

Witness #2 told officers he/she was inside their residence when they heard a commotion.  Witness #2 went outside and saw two black male subjects, believed to be juveniles, running southbound on Cedar Dr. from W. Hill Dr.  He/she stated the trailing suspect was holding something while he was running.  He/she then observed what he/she described as a brown four door Mercedes parked in front of his/her neighbor's residence, with an unidentified black male adult in the driver's seat.  He/she then watched as the two black male juveniles entered the Mercedes which immediately departed southbound on Cedar Dr.

28.  After speaking with witness #2, officers interviewed witness #3, who occupied the residence where victim #2 saw the Mercedes parked.  Witness #3 did not observe anything outside his/her residence, but stated they had surveillance cameras which could be downloaded on a later date.  Officers arranged for the download of the video, which was later acquired from witness #3 for analysis by homicide detectives.

**C.  Review of Surveillance Video**

29.  On August 13, 2021, I reviewed the surveillance video acquired from Det. Reyna which was previously retrieved from witness #1.  The surveillance video began at approximately 6:51 p.m. with the two suspects walking east on W. Hill Dr. and coming into the camera frame.  Both suspects appeared to be dressed in all black and continued walking as the victim's black BMW came into the frame from the right, traveling west on W. Hill Dr.  The victim pulled his vehicle to a stop as the two suspects stood near the passenger side of the vehicle, slightly

obscured from the camera due to an overgrown tree.  The cropped
screenshot below is included for reference, displaying the
victim's vehicle just a few yards shy of it's final stopping
point (suspects still approaching and obscured by tree):



30.  As the vehicle came to a stop, I heard a male voice
saying something to the effect of "What up?"  Over the next 70
seconds or so, I heard unintelligible male voices but no
distinct activity was seen on the video.  However, approximately
75 seconds after the suspects and victim initiated their
exchange, I heard the distinct sound what I recognized to be a
single gunshot, ringing out on the video.  I know from
experience investigating dozens of shootings as well as watching
and listening to countless hours of surveillance videos that it
is not unusual for surveillance video to only pickup one
gunshot, despite evidence confirming the presence of multiple
discharged rounds.  The presence of the gunshot was also evident
by the reactions of a witness who was visible on camera at the
time of the event.

31.  In the seconds after the gunshot rang out, I saw rapid
movement by the suspects visible through the leaves of the tree.

I then heard what sounded like a door being slammed, followed by a male voice shouting what I interpreted to be, "Go," just as the two suspects began sprinting away westbound towards Cedar Dr. and out of view of the camera.  Approximately five seconds after the suspect's initiated their sprint from the victim's car, I heard the distinct sound of a metal object falling to the ground and spinning, followed again by seemingly distant male voices shouting two short phrases.

32.  Prior to reviewing the video, I spoke with Det. Reyna and other seasoned officers who commonly encounter suspects tossing firearms.  Det. Reyna and others who observed the video were highly confident in their belief that the sound was a pistol falling to the ground, a conclusion I agree with based on my own training and experience.

33.  Finally, minutes after the shooting, the victim walked to a neighboring residence seeking help.  I could clearly see the victim walking from his vehicle toward the residence.  The victim, holding his neck with his left hand, had bright red blood streaming down the front and left-hand side of his white shirt.  A second, separate wound appeared in the form of a bright red spot near the rear part of the victim's right shoulder.  On video, I could hear the victim attempting to speak, but the victim's words appeared unintelligible, likely due to the gunshot wound in his neck.  Prior to the video cutting off, the victim walked back into the street near his vehicle, unsuccessfully attempting to seek aide from a passing vehicle.  The victim then walked towards the location where

11

officers found him.  I included a screenshot from the
surveillance video depicting the victim's gunshot wounds:

34.  I then moved on to a review of the surveillance video
gathered from witness #3, also provided to me by Det. Reyna.  I
noticed the surveillance video, pointed northeast from Cedar Dr.



towards W. Hill Dr., pick up the suspects' approach to the
victim's vehicle as they walked along the north side of W. Hill
Dr.  Approximately one minute and forty seconds later, the video
captured the suspects as they ran along the north curb line of
W. Hill Dr., turning south, and crossing the street.  The video
clearly showed the suspects sprinting south of the eastern
portion of Cedar Drive.  Although the exact times depicted on
both cameras did not match, a common occurrence when comparing
multiple surveillance systems, I am confident the suspect I saw
on witness #3's surveillance system are the same suspects from
the prior video, as the clothing and direction of travel
matched.

35.   As the suspects rounded the corner, I noticed the lead suspect to be a black male, tall and appearing be heavier build than the other suspect, wearing a black hooded sweatshirt, black sweatpants with white around the knees, and dark colored shoes. The lead suspect looked back as the suspect to the rear appeared to reach down for something.  I saw the trailing suspect to be a shorter black male of average build, wearing a black hooded sweatshirt with white lettering or a white design on the front, sporting black pants and red-colored shoes.  I have included a screenshot from the surveillance video, taken just after the lead suspect looked back, which shows which shows both suspects dressed in black approaching the Mercedes:



36.   I continued my analysis of the video and watched as a gold Mercedes E Class sedan, with its driver's door window partially open, traveled north on Cedar Drive and came to a stop just one residence south of W. Hill Drive.  The lead suspect went immediately to the rear passenger door, opening and getting

into the sedan.  The trailing suspect, visible carrying a black tote bag strung over his left shoulder, went to the front passenger door.  A spilt second after the front passenger door closed, the Mercedes made an immediate turn to the west and into the closest available driveway.  I noticed the driver's side window rolled up as the vehicle was turning, obscuring the driver's appearance through dark tinting which covered the side and rear windows of the luxury sedan.

37.  As the driver pulled in the to the driveway, the driver immediately put the vehicle into reverse, backing out quickly to the north, and then accelerating hard to travel south down Cedar Drive, back tracking its prior route.

38.   I have included an area map generated via Google Earth which depicts the victim's vehicle in relation to where the suspects were picked up by the Mercedes.  The map also includes arrows depicting the Mercedes' route of travel.  The



map (seen below) shows the relatively close proximity of where the shooting occurred and where the suspects were picked up.

**D.   Interview of Victim's Family & Cell Phone Analysis**

39.   Det. Reyna interviewed the family of the victim, learning the victim operated a mobile marijuana dispensary business.  Family members stated the victim had armed himself with a firearm due to the inherent dangers of being involved in that type of business.  Det. Reyna learned the victim had acquired a 9mm Smith and Wesson pistol bearing serial number NJT4801, purchased by the victim's brother and then provided to the victim for protection.  I believe this is the pistol Martrell and JONES stole from the victim during the robbery.

40.   Det. Reyna learned, both from speaking with the victim's family and also from inspecting the victim's phone, the victim utilized his phone and Snapchat account to conduct his marijuana sales business.  Det. Reyna identified the victim's Snapchat account as utilizing display name "Tree Sap Inc" and user ID numba.1hustlaaa, and learned the victim utilized cell phone number 626-598-4058.

41.   Det. Reyna later analyzed the victim's cell phone using the passcode to the iPhone provided by the mother of the victim's child.  Det. Reyna saw that just prior to the shooting, which was reported at 6:54 p.m., the victim had messages sent at 6:45 p.m. and 6:49 p.m. reading "the school" and "yo" as well as cancelled calls with a Snapchat account user utilizing display name "Kdb_3x" and user ID mrmaketoomuch.  Det. Reyna believed

15

the message reading "the school" sent by the victim was in reference to Cajon High School, located at 1200 W. Hill Drive.

42.  I later analyzed the exchange on the victim's Snapchat account and saw the victim provided phone number 951-307-5716 to Kdb_3x (user ID mrmaketoomuch) after quoting prices, with the victim's message stating, "Got like 13 ounces, I can do 1300, 100 a oz" and the Kdb_3x responding simply "Kt."  I later queried the number provided by the victim.  The number returned as registered Inteliquent, Inc., a wholesale communications company which provides services to voice over internet protocol ("VoIP") service providers.  According to records provided by Inteliquent, Inc., telephone number 951-307-5716 was registered to another service provider, namely TextNow, Inc., from July 1, 2021, through August 29, 2021.  I later reviewed records provided by TextNow, Inc. in response to a federal search warrant.  Based on my review of the information, it did not appear JONES contacted the victim utilizing the telephone provided during the Snapchat conversation.

**E.   Identification of Suspect Mercedes**

43.  On August 5, 2021, a previously interviewed witness contacted SBPD and stated he/she had observed the suspect Mercedes parked at a nearby apartment complex.  Det. Reyna met with the witness who pointed out a gold Mercedes, which displayed California License Plate 8VRW535 and was parked in the driveway to the apartment complex located at 1064 W. 48th St. in San Bernardino.  Det. Reyna noted the apartment complex was just

16

a block south of scene of the shooting, less than half a mile drive from the scene.

44.  Det. Reyna saw both vehicles were a match in make, model, and color.  Det. Reyna then compared the specific features of the suspect Mercedes in the surveillance video with those seen on the vehicle parked at the apartment complex.  Det. Reyna saw both vehicles had identical collision damage to the right front bumper, as well as matching tinted windows, wheels, and sunroofs.  Thus, Det. Reyna believed the vehicle parked at the complex was in fact his suspect vehicle from the homicide.

45.  Members of the SBPD Special Investigations Unit ("SIU"), the team I am presently embedded with as part of my assignment working out of the ATF San Bernardino Satellite Office, conducted surveillance on the Mercedes and the apartment complex.

46.  SIU officers observed the suspect Mercedes to be parked closest to the front door for Apartment 2 at 1064 W. 48th St, located on the lower level of the southwest corner of the complex.  SIU officers observed two black male subjects, in their late teens to early 20s, with physical characteristics which matched those provided by witnesses and seen on surveillance video which captured the shooting.  The two subjects entered and exited Apartment 2.

47.  While SIU officers conducted surveillance, SBPD criminal intelligence personnel conducted a workup of Apartment 2.  Det. Reyna learned the apartment was associated with Rontrell, who was tied to a June 3, 2021, carjacking

17

investigation that resulted in Rontrell's arrest.  Det. Reyna
examined a booking photo taken at the time of Rontrell's arrest
nearly two months earlier and noticed his physical appearance
matched that of one of the two suspect's running from the
homicide victim's BMW.  SIU officers on surveillance reviewed
Rontrell's booking photo and confirmed Rontrell was a subject
they saw repeatedly entering and leaving Apartment 2.  I later
examined the report associated with Rontrell's June 3, 2021,
arrest and learned the following:

       a.    On June 3, 2021, SBPD officers received reports
of a carjacking in the city, with the suspect using a firearm to
threaten the victim.  Officers quickly located the victim's
vehicle and a high-speed pursuit ensued.  Officers pursued the
driver who subsequently got out of the vehicle and fled on foot
approximately halfway down 4th street south of W. Reservoir Dr.
and W. 48th St. (approximately 200 yards northwest of Apartment
2).  Officers recognized the driver matched the description of
the carjacking suspect and pursued the suspect during a short
foot pursuit, finally taking the suspect into custody in the rear
of 4200 N. Cedar Drive.

       b.    As the suspect was being escorted to the nearest
marked unit, three confrontational subjects started aggressively
moving towards the arresting officers.  The three subjects
started throwing up hand gestures the officers recognized to be
gang signs.  One of the three subjects yelled to the officers,
"On Crips, you're not taking my cousin!"  SBPD Officer A.
Estrella stepped in front of the three subjects to prevent them

from interfering with placing the carjacking suspect in the marked unit.  The three suspects repeatedly refused to back up or follow Officer Estrella's commands.  One of the three suspects, later identified as Rontrell, pulled out a cell phone and turned on its light, attempting to distract and blind an Officer Estrella, standing just three feet in front of him.  Officer Estrella noted at the time Rontrell had clenched fists and was displaying what he believed based on training and experience to be pre-assault indicators.  Rontrell continued to shuffle around in a fighting stance while boasting he was a grape street gang member, taunting the officers to fight.

c.   While Rontrell was confronting Officer Estrella, a second subject, later identified as JONES, turned to walk away as if he was leaving the confrontation.  Suddenly, JONES turned around and quickly walked in Officer Estrella's direction, bumping Officer Estrella with his left shoulder then placing his cell phone in the officer's face.  Officer Estrella attempted to keep moving as the third subject keep moving his hands to his waistband.  The officers on scene suspected the three were notified by the carjacking suspect and were possibly trying to distract and delay officers from recovering evidence, including an outstanding firearm believed to have been tossed during the foot pursuit.  The three subjects continued to taunt the officers bragging that the officers wouldn't touch them due to their status as Crips gang members.

d.   Officer Estrella attempted to detain JONES, with JONES pulling away then tripping on his own feet, and going to

19

the ground.  After a short scuffle, JONES was taken into custody.
Approximately three minutes after JONES was taken into custody,
Rontrell again approached officers, claiming he was upset JONES
had been detained.  SBPD Sgt. T. King instructed Rontrell to back
away from the officers and Rontrell refused, waving around a
purple dew rag and stating he was a grape street gang member
while also yelling, "I'm not moving!"  Rontrell challenged Sgt.
King and the other officers present to a fight, balling up his
fists.  As Sgt. King and Officer Estrella approached Rontrell,
who was standing in an intersection creating a traffic hazard,
Rontrell yelled, "You better catch me," before sprinting
northbound from the location.  After running 80 feet, Rontrell's
shoe flew off, causing him to fall to the ground.  Rontrell was
taken into custody.  Rontrell, JONES, and the third involved
subject were cited for violations of California Penal Code
148(a)(1) willfully resist, delay, or obstruction of a peace
officer.

48.  After reading the report documenting Rontrell and
JONES's arrests for obstruction, I examined body camera footage
of the event.  I saw JONES was wearing red high-top sneakers,
which I recalled as seeing on the trailing suspect during
analysis of the surveillance video which captured the two
suspects fleeing the homicide to the Mercedes getaway vehicle.

49.  I then examined the criminal histories of JONES and
Rontrell.  I was aware that at the time of the obstruction
arrest, JONES was still a juvenile, just 14 days shy of his 18th
birthday.  However, I found it notable that in the preceding 15

months, JONES was arrested once for burglary and twice for robbery.  Additionally, I saw that Rontrell had an arrest for battery.

**F.   Search Warrant Executed on Apartment 2 & the Suspect Mercedes**

50.   On August 10, 2021, Det. Reyna authored a state search warrant for both the gold Mercedes and 1064 W. 48th St. Apartment 2.  The search warrant for both the vehicle and the apartment was signed and issued by the Honorable Judge Libutti in the Superior Court of California, County of San Bernardino.

51.   On the morning of August 12, 2021, at approximately 9:30 a.m., SBPD officers executed the warrant.  Officers made announcements for occupants to exit the residence, but the occupants delayed for approximately three minutes before complying with officers' demands.[3]  Based on a review of the photos and video footage from the search, I estimate the size of the apartment to be less than 800 square feet.

52.   Officers detained Martrell and Rontrell, along with two other adults and two juveniles.  Rontrell was in possession of an Apple iPhone which was in his pocket when he was detained leaving Apartment 2.  During an initial interview with Det. Reyna, Rontrell confirmed the cell phone which was seized from his pocket was in fact his phone.  Rontrell also identified a

---

[3] In prior affidavits, I relied on the estimate of the on-scene officers and stated that the delay was approximately five minutes.  I have reviewed the body camera footage and the time stamps on the body camera footage shows the delay was approximately three minutes.  The delay was unjustified given the size of the apartment and to the officers on the scene, who were executing a high-risk warrant seeking evidence relating to a shooting, the delay seemed even longer.

second Apple iPhone recovered from inside the residence as also
his phone.  Detectives assigned to the Homicide and Robbery
Units then initiated their search.  The following is a summary
of the items recovered during the search of the residence:

      a.    In the living room, Det. D. Sims located an empty
9mm high-capacity handgun magazine in the bottom drawer of the
entertainment center.

      b.    In the northwest bedroom, Det. J. Alvarez located
a pistol case for Zigana PX-9 9mm pistol, with the box displaying
serial number 712135218775.  I later ran the serial number
depicted on the box and learned the associated pistol was stolen
on May 25, 2021, in West Plains, Missouri.  Det. Alvarez looked
inside the pistol case and recovered a box of DRZ 9mm ammunition,
as well as miscellaneous gun parts.  Det. Alvarez also located a
9mm/.40 caliber handgun magazine loader on the closet shelf.  A
black Mercedes key fob was also found in the room on the TV
stand, along with indicia with the name "Rontrell Shaw" on the
floor near the closet.  Four black sweaters were located in the
closet, as were two pairs of black Jordan shoes.  Det. Alvarez
saw a black and red backpack which contained a brown wallet with
a Nevada Identification Card displaying the name "Rontrell Shaw."
Det. Sims found the second Apple iPhone belonging to Rontrell in
the same backpack.

      c.    In the northeast bedroom, Det. J. Joyce located a
black duffle bag concealed inside a black trash can near the
north wall of the bedroom.  Inside the duffle was a black and
tan, unserialized Glock-type Polymer80 handgun equipped with a

tactical light.  The handgun, categorized as a privately made firearm by ATF and more commonly referred to as a "ghost gun" in the law enforcement community, was loaded with an inserted magazine containing eight rounds of 9mm ammunition.

53.  The 2004 gold Mercedes was towed to the SBPD station for forensic processing and search by Det. Sims of the Homicide Unit.  A DMV records check indicated the registered owner was H.E. [4] or B.J. of Rosemead, California, with a release of liability to M.E. of Upland, California.  Det. Sims noticed the outside of the vehicle was in overall poor condition, with outside and inside of the vehicle exhibiting moderate damage.  After the vehicle was processed for forensic evidence, Det. Sims searched the passenger compartment.  The following is a summary of the items identified during Det. Sims search:

a.   In the driver's door pocket, two separate receipts for the Wing Stop located at 4244 University Parkway in San Bernardino was found.  The receipts were dated July 31, 2021 at 9:13 p.m. and 9:15 p.m. respectively, approximately two hours after the homicide.  The Wing Stop was only 2.6 miles from the scene of the homicide.  A third receipt was dated July 25, 2021, at 1:45 p.m. for the Stater Brother at Shandin Hills.  The Stater Brothers Shandin Hills location is located at 977 Kendall Dr. in San Bernardino, .9 miles from the homicide location.

b.   In the glove compartment, Det. Sims located a San Bernardino County Sheriff's Department booking record for

---

[4] The subject's name is known to law enforcement but abbreviated.

Rontrell.  The booking record was dated June 4, 2021, at 2:30 a.m.  Two citations in Rontrell's name were also located, one dated June 3, 2021, and the other dated June 4, 2021.
In the rear passenger seat, just inside the back window, Det. Sims located a black Vans sweatshirt.

54.  Officers transported Maretrell and Rontrell from their residence to the SBPD station for interview by Det. Reyna.  Both subjects were placed in separate interview rooms and their handcuffs were removed.

### G.  Martrell Admits JONES Brought a Gun Instead of Enough Money to Make a Purchase

55.  Det. Reyna entered the interview room and greeted Martrell.  Det. Reyna learned Martrell resided at Apartment 2, mentioning it was his mother's residence and that he had been residing at the address since the beginning of 2020.  Det. Reyna told Martrell he would like to discuss the investigation which led to the execution of the search warrant earlier that morning as well as the recovery of the firearm at the residence. Martrell agreed to speak with Det. Reyna and stated he was trying to get his life back together after being shot in the preceding year.  Det. Reyna then advised Martrell of his *Miranda* rights and Martrell said, "Yes sir," when asked if he understood the rights that had been read to him.  Martrell then signed a waiver which covered the *Miranda* warning.  The following is a summary of the *Mirandized* interview which was audio and video recorded and provided to me by Det. Reyna:

a.    When asked why he believed the police were at his residence, Martrell speculated it was possibly related to his cousin's arrest nearby earlier in June 2021, mentioning rough specifics of the event, including his brother Rontrell's arrest for obstruction.  Martrell stated he was not present at the incident but was trying out a new job in the high desert.  When asked by Det. Reyna if he was presently employed, Martrell stated he was not, acknowledging he could probably get a job at a fast-food restaurant but insisting he would not flip burgers.

b.    When asked about the gun recovered at the residence, Martrell stated he had seen no firearms present in the residence.  Referencing the firearm, Martrell stated, "My brother, I'm not saying he don't have a gun, but me personally do I have knowledge of him, no.  Never."  Martrell claimed he had never seen his brother with a firearm.  When asked if any other contraband would be located in the residence, Martrell speculated possibly a small quantity of marijuana, disclosing the adults in the residence, including he and his brother Rontrell, regularly smoked marijuana.  Martrell specifically stated they did not sell marijuana, saying he would rather sell boxes of candy then sell drugs.

c.    Martrell stated the gold Mercedes outside the residence belonged to Rontrell, mentioning he just got the vehicle.  Martrell mentioned his brother purchased the vehicle on Offer Up, speculating it was purchased on July 31 or August 1, 2021.  Referencing who drove the Mercedes, Martrell stated his

brother Rontrell was the primary driver, but was hesitant to agree that no one else ever drove the Mercedes.

       d.    Det. Reyna asked Martrell what he remembered about July 31, 2021. Martrell stated it was a cousin's 22nd birthday that day, adding he was in Las Vegas to celebrate his cousin's birthday. Martrell stated the cousin moved to Las Vegas in 2018 and that he was close to the cousin due to the cousin's family struggles.

       e.    When Det. Reyna cautioned Martrell that it was in his best interest to tell the truth, Martrell clarified that he was in San Bernardino earlier on July 31, 2021, only going to Las Vegas later that night. Martrell stated he smoked so much marijuana that he could not remember what time, but estimated between 5:00 p.m. and 7:00 p.m., stating he traveled with five people in the car, all being his cousin or his cousin's friends. Martrell stated his brother Rontrell was not with him on the trip, and that he returned from the trip the following afternoon.

       f.    Det. Reyna encouraged Martrell to set the record straight on what occurred earlier on July 31, 2021, telling Martrell to tell him what happened. Martrell stated he and his brother, Rontrell, and a third person, later identified as JONES, needed some marijuana. He stated, "Some dude had came through, whatever. We met him at the school. We get there to get the weed, and ah. Fuck. I don't want to say it. Fuck. I don't want to snitch or nothing." Martrell paused, placing his head against the wall in the interview room. Det. Reyna again reinforced his earlier advice to Martrell, telling him to tell

the truth and stating he was aware Martrell was on scene. Martrell acknowledged that he, Rontrell, and JONES[5] did not have enough money to purchase the marijuana that they had ordered by saying the following:

   i. "Yeah I was there, but I ain't gonna lie to you, I did participate in it." Martrell continued, "we probably got like $30 on all of us. He's telling him to bring a pound worth of weed through. $1300, or some shit like that. Telling him he got the money for that, or whatever. You know, me just wanting to smoke, I'm going along with it, fuck it. We got to go right there and we about to get the weed."

   g. After acknowledging that he knew the robbers did not have the money to buy the marijuana they had ordered, Martrell went on to acknowledge he knew that one of robbers was armed with a firearm by saying the following:

   i. ". . . . I knew, I ain't gonna lie to you and say I didn't know he [referring to one of the other robbers] had a gun like, you know, I didn't know he had a gun. I knew he had a gun like, but I didn't think he was gonna like shoot him or nothing like."

   h. Det. Reyna asked which school the two met the victim at, with Martrell responding, "Cajon High School." Det. Reyna asked what kind of car the victim was driving and where was the victim seated. Martrell responded, "Small black car, I not sure what kind though," and "In the driver's seat." Martrell

---

  [5] As explained further below, initially, Martrell did not identify JONES by his true name and referred to JONES as "Jeremy."

stated that JONES was pretending to reach for his phone, but he was "also reaching for the gun at the same time."

      i.    Det. Reyna asked what the victim did when the gun was pointed at him.  Martrell stated the victim was reluctant to comply, adding, "I guess the guy already had a gun."  Det Reyna stated, did you see the guy with a gun?"  Martrell responded, "Yeah" and explained when the third suspect came back, he had a second gun.  Det. Reyna asked where the victim stored his firearm.  Martrell stated, "It was in his door."

      j.    Det. Reyna asked what the victim did with the gun.  Martrell said, as the victim was grabbing his own gun, but "It was too late" for him.  Martrell estimated JONES shot the victim once or twice, adding he did not know where the victim was hit.  Martrell stated the JONES brought the marijuana back to the car and it was in a black bag.

      k.    Martrell also stated that he kept some of the stolen marijuana after the robbery.  Martrell described both the gun JONES used to shoot the victim as well as the victim's gun as non-descript black handguns.

      l.    Martrell said he and JONES fled the scene in his brother's car.  Det. Reyna asked, "Rontrell's car?"  Martrell responded, "Yeah," then interrupting Det. Reyna and stated what sounds to me like, "Our intention was to rob him" (though the recording is not entirely clear).  Martrell stated his brother Rontrell was driving and that he, his brother, and JONES were the only ones in the vehicle when fleeing the scene.

m.     Det. Reyna asked how Rontrell knew to pick up Martrell and the third suspect.  Martrell stated, "He wasn't really picking us up.  He was already there."  Martrell stated Rontrell then drove to a Circle K near Date St. and Del Rosa to drop off JONES.  Martrell stated he estimated JONES gave him three grams of marijuana, with JONES taking the rest of the marijuana and the two guns.  When Martrell stated Rontrell insisted on getting the suspect out of the car because he just shot someone, Det. Reyna questioned how Rontrell had knowledge of the shooting.  Martrell stated he had told Rontrell about what happened.  Martrell stated after he and Rontrell dropped off JONES, the two went back to Apartment 2.

n.     Det. Reyna told Martrell he needed more info to identify JONES, who at that point in the interview had just been referenced by Martrell as "Jeremy."  Martrell stated he didn't know "Jeremy's" full name and said he had poor memory from frequent use of marijuana.

o.     Martrell then provided a physical description of JONES, the person he was identifying as "Jeremy" to that point, describing him as a black male, caramel in color (lighter than Martrell's skin tone him), shorter than him, estimating 5'7"-5'8", approximately 160 lbs, average build.  Martrell stated JONES had no tattoos and usually had short hair, but it was last in "twisties" or short braids, no longer than his chin.  Martrell stated he was wearing a black 49ers sweater with some sweats during the shooting.  Martrell stated JONES, still referring to him as "Jeremy," had was wearing had a grey sweater with the

29

words "Cali" written in black on and black pants during the robbery.

p.    Det. Reyna asked for "Jeremy's" Snapchat and social media accounts and Martrell could not affirmatively provide the exact user IDs for each of the accounts. Martrell stated his own Instagram account was under user ID "BMGtrell34" and Facebook user ID "BMG Trell."

q.    Det Reyna asked for the time of the event and Martrell opened up, providing a narration of the events. Martrell stated he and his brother were at home playing a game when Rontrell got a call from "Jeremy" who invited Rontrell to get together to smoke marijuana. "Jeremy" stated he did not have any marijuana, but had approximately $30, Martrell had approximately $20 of his own, and his Rontrell had $15. Martrell stated he believed "Jeremy" was texting his dealer on Snapchat and ordering a pound of marijuana. Det. Reyna asked how much the dealer (the victim) offered to sell the pound for and Martrell stated he believed it was going to cost $1,300, despite only having an estimated $60 collectively between the three.

r.    Sensing Martrell was holding out on details as Martrell stated he never viewed the Snapchat correspondence, Det. Reyna asked Martrell how he knew the ordered amount and quoted price. Martrell responded that "Jeremy" went to Apartment 2 with him and his brother before the shooting, and that the victim was bragging about all the marijuana the victim had for sale, showing videos of pounds of marijuana. Martrell stated, "This is how I found out that we, he was going to rob him. We ah. Actually, we

30

was gonna finna walk to meet him." Martrell said the victim took forever, so when the victim stated he was at the location, Martrell stated, "So my brother park, we get out and walked up. As we walked up." Det Reyna interrupted and asked where Rontrell dropped the two off. Martrell responded, "He dropped us off right in front of the school. He wasn't trying to hide or nothing like that."

s.   Carrying on with the story as both he and "Jeremy" were out of Rontrell's Mercedes, Martrell stated, "As we walked up. Ah. He whispered to me. I'm gonna get him. I'm gonna get him." Det Reyna asked, "What did that mean to you?" Martrell stated, "I kind already knew this dude trying to do something, but then once he showed me the gun, I already knew what time it was," telling Det. Reyna that "Jeremy" had the gun inside his front waistband, sliding it to his right side as he sat down. Det Reyna asked Martrell if "Jeremy" said anything else walking up to the car and Martrell stated, "He told me really to just watch out for him." Martrell stated "Jeremy" kept saying "I'm gonna get him." Det. Reyna questioned whether Martrell interpreted that as meaning "Jeremy" was going rob the victim and Martrell responded, "I knew he was. I didn't think he was going to shoot him, dude bro, to tell you the truth. Did he die?" Det. Reyna nodded up and down.

t.   Det. Reyna asked where Martrell was standing when "Jeremy" was in the car. Martrell stated he was leaning on the vehicle standing over the open door with "Jeremy" seated in the victim's vehicle during the exchange. Going over the details a

second time, Martrell stated as the victim looked down at his
phone to get the info for his own cash app, "Jeremy" pulled out
the firearm.  "Jeremy" did not ask the victim for any money, just
telling the victim that he was taking the victim's marijuana.
Martrell said by that time, the victim attempted to think fast
and pulled his own firearm, but before the victim could raise his
own firearm completely out of the driver's side door panel, he
watched as the first shot went off.  Martrell said at that time
he started running, clarifying that the victim did not have time
to fire off any rounds, and believing "Jeremy" shot twice.

u.    Det. Reyna asked where "Jeremy" pointed the
weapon and Martrell stated the weapon was pointed up on the
victim, not quite at the victim's head but on the victim's upper
body.  Martrell stated he got picked up by Rontrell who was
already in the area, stating he got into the front seat of the
Mercedes and "Jeremy," holding the marijuana and the victim's
gun, got into the back seat.

### H.    Rontrell Reports Telling Martrell and JONES Not to Rob the Victim, Says "I Helped Them," and Kept a Share of the Robbery Proceeds

56.    Det. Reyna entered the interview room and greeted
Rontrell, asking him if he needed a water or anything to drink.
Det. Reyna asked Rontrell if he was ready to talk and Rontrell
acknowledged Det. Reyna, who then apologized for the delay in
the interview.  Det. Reyna told Rontrell he had just finished
the interview with Martrell and said that Martrell had come
clean.  Det. Reyna encouraged Rontrell to tell the truth,
stating that he was aware he had misdemeanor warrants and that

he would be booked on the warrants and possibly bail out over the weekend.  Det. Reyna confirmed Rontrell's identity and Rontrell disclosed he lived at Apartment 2 just like his brother.

57.  Det. Reyna advised Rontrell his *Miranda* rights and Rontrell said "Yeah," when asked if he understood the rights read to him, and "Yeah, I'll talk about it," when asked if he wanted to discuss the investigation.  Rontrell then signed a waiver which covered the *Miranda* warning which was just advised to him.  The following is a summary of the *Mirandized* interview which was audio and video recorded and provided to me by Det. Reyna:

a.    Rontrell stated he was not aware what investigation Det. Reyna was referring to.  Det. Reyna then disclosed the investigation was related to the July 31, 2021, encounter where he and his brother were trying to purchase marijuana.  Rontrell initially stated he dropped "them off" and 30-40 minutes later picked "them" up.  Rontrell stated when he went back to pick them up, he saw them running and drove the two (thus far unidentified in the interview) back to his house, seeing a police response immediately after.

b.    Rontrell stated after he picked up Martrell and "Nine," whom he later identified as JONES, and brought them back to his apartment, he saw the police response and asked his brother what was going on.  Rontrell stated his brother told him, "We did a lick." Rontrell stated Martrell and "Nine" split up the marijuana and then "Nine" left his apartment.

33

c.   Det. Reyna asked what time the "Nine" arrived at Apartment 2 on July 31, 2021.  Rontrell stated "Nine" took a bus and arrived at the Apartment 2 about 10:00 a.m.  Rontrell stated "Nine" and his brother began smoking marijuana and he later left the apartment to get food with his girlfriend.  Rontrell stated upon his return around 4:00 p.m., he went and picked up the two when they were running down the street.

d.   Rontrell later clarified stating around 3:45 p.m. or 4:00 p.m., he dropped off his brother and "Nine" near Cajon St., seeing the "Nine" talking on the phone and telling someone on the other line to bring the marijuana to Cajon (High School). Describing what followed after he dropped the two off, Rontrell stated, "I guess he pulled up, they chop it up, all I hear is pop, pop."  Det. Reyna told Rontrell not to guess, but to tell him the truth.

e.   Rontrell stated he dropped his brother and "Nine" off in front of Cajon High Scholl and no one was there.  Rontrell stated he drove back to the house.  Rontrell stated, "he called the dude and was like, bring the weed up here."  Det. Reyna asked Rontrell how he knew "Nine" called the victim and Rontrell said JONES had done so as he was dropping them off.  Rontrell stated he then went home and heard two shots.  Det. Reyna questioned how it was possible Rontrell heard the two shots all the way at his apartment.  Rontrell stated he was outside getting back in his car, adding he had a bad feeling his brother and "Nine" were going to do something stupid.  Rontrell stated he warned the two

prior to getting out of the car to not rob the victim, stating it was not worth ruining their lives for a pound of weed.

　　f.　Suspecting Rontrell was holding back information, Det. Reyna asked Rontrell how he knew the two were going to buy a pound.  Rontrell said, "They told me they was picking up two ounces."  When the two returned to his car, Rontrell said he saw the bag with a "big ass bag of weed," stating he had sold marijuana before and had experience judging prices and quantities.  Rontrell said when he heard the gunshots coming from the area of Cajon, he "hit the block" and drove north on Cedar Ave., seeing his brother and "Nine" running towards him. Rontrell stated he observed both Martrell and "Nine" sweating, then drove the two home to Apartment 2.  Rontrell said it was then that he heard the police and asked the two what had happened.

　　g.　Rontrell stated when his brother and JONES entered his house as police cars responded to the scene, he began cussing the two out.  Rontrell stated the two showed him the bag of marijuana which was taken from the victim.  Rontrell stated about two hours later after the police presence had died down, "Nine" "took his half" and left.

　　h.　Det. Reyna asked for details about the two running back to Rontrell's Mercedes.  Rontrell stated the two ran back with a "big ass black bag," first saying "Nine" was carrying it, but then correcting himself and stating Martrell was holding the bag, described as a black bag containing an entire pound of marijuana.  Rontrell stated the two were holding their pockets

but did not see any firearms.  Rontrell added that when he
dropped the two off, he also did not see any firearms, mentioning
again he believed the two were going to buy two ounces, one for
"Nine" and one to be split between he and his brother.  Rontrell
stated he provided $50 to the two before they got out of the car.

       i.   Rontrell stated when they got back to the
apartment, JONES exited the back seat and went up to the front
passenger seat where his brother was seated.  Rontrell stated
JONES then grabbed the bag of marijuana, packaged in a large
black Ziploc bag, taking it inside and later showing Rontrell.
Without being prompted, Rontrell stated, "He gave me mine, he
gave me about 56 grams and he got on.  My brother split the rest
and they got on.  I wasn't part of it."

       j.   Rontrell stated the victim was a large seller
within the Inland Empire area.  Referring to the cities served by
the victim, Rontrell stated, "Sometimes he went to Vegas, for
sure, cause that's where he came from that day, he told."  When
Det. Reyna asked how Rontrell knew the victim had traveled in
from Las Vegas, Rontrell stated "Nine" and Martrell had been
talking about it in his presence all morning.  Referring to
"Nine's" statement prior to the shooting and after, Rontrell
stated, "They had been telling me, it was going to be this much
of weed, but he got a lot more than what he told me.  You feel
me?  When they bring it back, that's when they split it down the
middle.  He gave me more than what he told me he was going to
give me.  He was only going to give me 14 grams.  He gave me 56

and left."  When asked how much "Nine" gave to Martrell, Rontrell
responded, "They split the rest down the middle."

      k.    Det. Reyna asked how Rontrell knew so much about
the victim and he stated both "Nine" and Martrell had showed him
pictures from social media, adding they were communicating with
the victim via Snapchat.

      l.    Rontrell stated the two did not talk anything
about the robbery when they were in the car, but once the two
were inside Apartment 2, they told him they had robbed the victim
and took the marijuana.  Rontrell said he did not believe
Martrell shot the victim, because Martrell had been shot in the
leg by members of the California Gardens Gang just six months
prior.

      m.    Rontrell stated when he dropped off Maretrell and
"Nine," he saw the victim's black BMW near Cedar Ave. and Little
Mountain.  Later, after "Nine" left his apartment, he drove back
up to the area and saw the police near the same BMW.  Without
being prompted by Det. Reyna, Rontrell stated, "But I did, I'm
gonna say if I did, I did have accessory to robbery.  Because I
helped them.  I helped them get there.  But the whole mission was
not supposed to be like that."

    58.  A short time later, Det. Reyna brought the iPhone
which was taken off Rontrell's person at the search warrant
into the interview room.  Rontrell provided consent to search
the phone and provided his passcode of "656565."

    59.  Det. Reyna asked about the pistol found at Rontrell's
house.  Rontrell stated, "If there is any gun found at my house,

it's mine." Rontrell stated he had a 9mm Glock 19, mentioning it said Polymer80 on the bottom with a green bottom and a black top. Det. Reyna asked about the Zigana 9mm and Rontrell stated he had already sold the firearm. Seeing multiple photos of firearms on Rontrell's phone, Det. Reyna asked Rontrell about the photos. Rontrell stated his cousins would send him photos of firearms and Rontrell would arrange for purchasers of the firearms. Det. Reyna then stepped out of the interview room.

**I.   Additional Suspect Interviews**

60.  To this point in the interviews, neither Martrell nor Rontrell identified JONES. Martrell referred to JONES as "Jeremy" and Rontrell referred to JONES as "Nine." Det. Reyna pressed forward with the interview to attempt to identify the third suspect.

61.  Det. Reyna asked about Rontrell's knowledge of Martrell and "Nine" pulling off the robbery. Rontrell stated he only learned of the robbery as the two were running up to his car and seeing the police responding. Det. Reyna asked Rontrell if he saw "Nine" with a gun after the robbery. Rontrell stated he did, he saw the firearm in his right hoodie pocket, adding he thought it was an all-black H&K .40 caliber. Rontrell stated he knew "Nine" had taken the victim's gun as well, mentioning his brother carried the bag of marijuana to the getaway vehicle. Referring to "Nine," Rontrell stated, "So he came up on weed, gun, and some money, and he left." Rontrell said he never really saw the victim's gun pulled out, but saw a second firearm inside "Nine's" hoodie once they got back to Apartment 2.

62.  Rontrell stated "Nine" told him the victim already had the gun on his lap, but once the victim was at ease and placed the firearm in the door of the BMW, he put his own gun to the victim's head.  Rontrell said "Nine" gave Martrell the marijuana to hold so he could carry the two firearms and that when they arrived back at Apartment 2, "Nine" was very scared, wanting to pack up his things and leave the apartment.  Det. Reyna again asked Rontrell how he knew to pick up the two and Rontrell again stated he heard the gunshots and immediately drove back to the area.

63.  Det. Reyna left the interview room for a few minutes while homicide detectives continued to attempt to identify JONES.  Det. Reyna then returned and asked Rontrell if "Nine" was ever arrested with him.  Rontrell stated "Nine" was present when he was arrested months prior for obstruction while at his residence.  Det. Reyna then presented a booking photo of JONES and asked Rontrell if the subject depicted in the photo was the subject he had previously been referring to by a street moniker, "Nine."  Rontrell stated it looked like him.  Det. Reyna asked for Rontrell's signature and date on the photo confirming the subject in the photo was JONES, the third subject involved in the robbery.  Rontrell then signed and dated the booking photo of JONES.  Det. Reyna then concluded the interview with Rontrell.

64.  Det. Reyna then immediately walked into Martrell's interview room and presented a copy of the same picture of JONES.  Det. Reyna said, "Who is that?"  Martrell responded,

"That's my cousin, Dillion, Dillion JONES." Det. Reyna asked
Martrell if JONES was the shooter and Martrell stated he was
not. Det. Reyna asked Martrell if he was lying and without
hesitation Martrell responded, "Nope." Martrell was asked for
JONES's location and Martrell said, "He on probation so you can
get your address from his probation." Det. Reyna told Martrell
his brother had identified JONES, but his lying was going to get
him in further trouble.

65. Det. Reyna attempted to minimize the event, telling
Martrell that JONES would be out in a few years due to his age.
Martrell responded emotionally, "That's my baby cousin, c'mon
like." Det. Reyna said, "He didn't mean for this to happen, so
is he the shooter?" Almost without motion and with a blank look
on his face, Martrell gently moved his down and up in a manner
Det. Reyna interpreted to be confirmation of his question.
Seeing Martrell's body language and without delay, Det. Reyna
responded, "Yeah?  Ok." Det. Reyna instructed Martrell to sign
the photo with his name and date and time. Det Reyna said, "The
lying is over." Martrell responded, "I ain't lying, but I can't
do that though." When Det. Reyna said he understood if Martrell
was hesitant to finger a family member, Martrell responded,
"It's my baby cousin bro, you'd probably do the same." Martrell
then tried to minimize the robbery, stating they were intending
to purchase marijuana, just not the pound. Det. Reyna again
confirmed the details, "But when you guys walked up on the car,
he had his pistol and he told you. He told you he was going to
do it, right?" Martrell replied, "Yeah." Martrell stated he

could not put his name on the photo but stated he believed
because his baby cousin was involved, he felt some ownership for
the outcome.

### J.    Criminal Complaint & Arrest of SHAW Brothers

66.   On August 16, 2021, the Honorable Shashi H.
Kewalramani signed a criminal complaint against Martrell for
violations of 18 U.S.C. §§ 1951(a) (Interference with Commerce
by Robbery and; 924(c)(1)(A)(iii), (j)(1) (Use, Carry, Brandish,
and Discharge a Firearm in Furtherance of a Crime of Violence
Causing Death) and against for Rontrell for a violation of 18
U.S.C. § 3 (Accessory After the Fact) in case number 5:21-mj-
00527).

67.   On August 25, 2021, I transported Rontrell from the
custody of the San Bernardino County Sheriff's Department
("SBSD") to his initial appearance on the federal complaint.
During the transport of Rontrell, I interviewed him, after
providing a *Miranda* warning.

68.   I asked Rontrell for JONES's phone number, but
Rontrell stated JONES did not have cellular service to his cell
phone.  Rather, JONES strictly communicated through his cell
device by connecting to wifi, with Rontrell mentioning that
JONES had been sleeping on the floor of Apartment 2 during the
days leading up to the robbery.  I asked about Martrell's
possession of firearms.  Rontrell said Martrell was without a
firearm since he was shot, adding that Martrell was shot with
his own pistol after showing it off to the wrong people, who

subsequently stole if from Martrell's hands and shot him with it during an ensuing scuffle.

**K.    Identification of JONES's Snapchat**

1.    Records from Snapchat

69.   On August 23, 2021, I requested basic subscriber information from Snap, Inc., for Snapchat display name "Kdb_3x" and user ID mrmaketoomuch, the account communicating with the victim's Snapchat account immediately before the victim was killed.

70.   On September 8, 2021, I reviewed the information, including subscriber information and IP history, which was provided by Snap.

a.    I first examined the subscriber information portion of the return and noted there was no account creation information provided, but I saw the account was deactivated on August 3, 2021, just days after the July 31, 2021 homicide.  In the account change history portion of the subscriber information, I saw the timestamps for the deactivation and deletion of the account on the bespoke date, with the only other entry being on March 17, 2021, identified as a password change in the application by the user.

b.    I then examined the IP data portion of the return and saw the oldest provided information was a login on March 17, 2021, utilizing IP address 76.174.198.24.  I paid close attention to the IP addresses and their applicable timestamps which captured login and logouts of the Snapchat application by user ID mrmaketoomuch.  I recalled SBPD dispatchers sent their first

officers to the homicide scene at approximately 6:54 p.m. on July 31, 2021.  I saw IP address 75.141.113.205 was used to logout of the Snapchat application at 6:58 p.m., just minutes after the shooting.  I noted prior to that logout, the last reported IP address provided by Snapchat was a login on July 21, 2021, at 9:41 p.m.

      c.   Although the basic subscriber information did not provide any personal identifying information, I took note of the IP data provided.  I learned the provider of many of the IP addresses, including 76.174.198.24 and 75.141.113.205, was Charter Communications.

71.  On September 9, 2021, I requested basic subscriber information from Charter Communications for the identified IP addresses associated with Snapchat user ID mrmaketoomuch.  On September 14, 2021, I reviewed the information provided by Charter Communications.

      a.   I learned 76.174.198.24 was associated with subscriber Jameelah Sims of 1800 E. Old Ranch Rd., Apt 135, Colton, CA 92324.  I learned the account associated with the IP address and subscriber had been active since April 12, 2020.

      b.   I recognized both the name and address provided by Charter.  I knew Jameelah Sims was JONES's mother and that she was also present on June 3, 2021, when JONES was arrested for obstruction with Rontrell.  After learning JONES was arrested for robbery by the Colton Police Department ("CPD") on February 15, 2021, I acquired the associated report and body camera footage from Detective A. Jaeger, a homicide detective with CPD and the

on the robbery investigation.  I learned Det. Jaeger traveled to the residence and knocked on the door of Apt. 135.  JONES answered the door and was arrested on a warrant for the robbery which occurred in Colton on September 2, 2020.  Due to JONES's age at the time, Det. Jaeger had JONES's call his mother Jameelah Sims to return home and take custody of her son.  Det. Jaeger informed me JONES was given a citation and released to his mother at the scene.

c.    As I further reviewed the information provided by Charter Communications, I saw IP address 75.141.113.205 returned to subscriber Shandtrell Jones of 1064 W. 48th St. Apt 2, San Bernardino, CA 92407, with the account being activated on March 2, 2020.  I recognized the address as belonging to Martrell Shaw and Rontrell Shaw, as well as it being the site of SBPD's August 12, 2021, search warrant disclosed earlier in this affidavit.

2.    Search Warrant Return from Snapchat

72.    On September 17, 2021, the Honorable Sheri Pym signed federal search warrant for data related to Snapchat display name "Kdb_3x" and user ID mrmaketoomuch.  On September 23, 2021, Snapchat returned content from the account.  Over the following weeks, I began to review the information provided by Snapchat in response to the search warrant, which included subscriber information, IP data, geolocation data, friends, memories, photos, and videos.

a.    I learned from Snapchat that if a user has device-level location services turned on and has opted into location services on Snapchat, the company will collect location

data at various points during the user's use of Snapchat.  I also learned users have some control over the deletion of their location data in the app settings.

   b. After seeing the subscriber information and the IP data matching the original response from Snap, I examined the geolocation data which provided latitude and longitude coordinates in the decimal degree system, with a relative accuracy measured in meters.  I saw Snapchat provided 1572 independent GPS coordinates spanning February 19, 2021, through July 31, 2021.  As I parsed through the data, I found it notable that from approximately July 6, 2021, through July 31, 2021, geolocation data was regularly reported, often with 20 to 40 locations collected on a single day.  In fact, on July 31, 2021, Snapchat recorded 62 locations.  However, at 6:36 p.m., 18 minutes before officers were dispatched to the homicide scene, the geolocation data stopped being recorded.

      c.    I placed the last recorded coordinates, recorded at 6:36 p.m., namely 34.172, -117.306, into Google Earth and saw the location appeared to be on the parcel directly east of the Shaw brothers' apartment located at 1064 W. 48th St. in San Bernardino.  Utilizing a software tool in the Google Earth application, I placed a circle around the point and measured a radius of 39 meters to simulate the 39.66 meter relative accuracy provided by Snapchat with the coordinates (a constant for all provided geolocations).  Just inside the outer edge of the circle was the Shaw brothers' apartment.  I have included an image below generated by Google Earth to show a 39 meter radius around the coordinates:



      d.    Further examination of the returned Snapchat content revealed numerous short videos, marked as "memories." Prior to examining the videos, I familiarized myself with JONES's physical appearance and tattoos, viewing Det. Jaeger's body cam footage recorded during his February 15, 2021, arrest of JONES.

e.    I learned Snapchat collected latitude and longitude info as well as time and date information on selected memories.  After locating no memories on the date of the homicide, I looked for memories which had identical coordinates to those mentioned above and in the immediate proximity of the Shaw brother's apartment.  I identified a short two-second video timestamped on January 12, 2021, which featured a subject I recognized as JONES.  In the video, which featured JONES looking directly at the camera, I saw JONES puffing what appeared to be a blunt that was already burning and emitting a thick heavy smoke.

f.    While examining further videos, I noticed a five-second video recorded on May 12, 2021, which had no available geolocation data.  I clicked on the video and saw JONES looking directly at the camera, which was placed beneath him so the camera lens was looking up, similar in format to the previously mentioned video.  I saw JONES was waiving what appeared to be a polymer semiautomatic pistol in his hand, pointing the barrel directly at the camera, then raising the firearm to show an inserted high-capacity magazine made by Pro Mag, which was protruding well outside the weapon's magazine well.

g.    I slowed down the video and analyzed it frame by frame.  Based on my training and experience, as well as the physical characteristics of the pistol and the visible rifling in the barrel, I believe the semiautomatic pistol JONES possessed

was an actual firearm, resembling a compact Glock.  I included
screenshots of the video below:

 

73.  I identified two further videos, both featuring JONES
and running approximately 10 seconds a piece.  Both videos were
recorded on June 28, 2021, and started with JONES walking while
looking down at the camera.  During the first video, which was
set to background rap music, JONES walked casually down the
street while holding what appeared to be a small thin cigar in
his hand.  Approximately halfway through the video, JONES panned
the camera down to his waistline while simultaneously pulling up
his white t-shirt.  The camera then momentarily focused on the

lower portion of a black pistol frame which I observed to be partially stuffed into JONES's front waistband.  I examined the weapon, which had an inserted magazine, and recognized the markings on the grip to be consistent with a weapon manufactured by Taurus.  Further examination of the serrations on the grip led me to conclude the weapon was likely a Taurus G series model semiautomatic firearm.  After panning up and away from the weapon, JONES looked into the camera and used his hand and fingers to simulate firing a gun, moving his hand up and down, before ending the video.

74.  In the second video, filmed approximately 10 minutes later on the same day according to timestamp information provided by Snapchat, JONES again started the video by looking into the camera.  As the camera panned down towards JONES's torso, I saw JONES was holding open a zip-up sweater.  I noticed what appeared to be a black firearm protruding out and away from his front waistband.  JONES then panned away, proceeding to make gang signs with his hand.  I've found such displays a somewhat common occurrence on the social media accounts of suspected gang members I have investigated.  Just before the video concluded, JONES pointed the camera down to his waistline, which again featured a black Taurus pistol tucked into his waistband.  I've included screenshots from the video below:

 

**L.     Fingerprint Match from Victim's Car**

75.   On October 12, 2021, Det. Reyna provided me a report
authored by the San Bernardino County Sheriff's Department
Scientific Investigations Division CAL-ID Laten Print Section.
I reviewed the report that covered the examination of latent
fingerprints pulled by SBPD Forensics Division personnel from
the victim's vehicle and the scene of the search warrant at the
Shaw brother's residence.  According to the examination,
multiple latent prints pulled off the victim's BMW matched those
of Martrell.  Recovery locations include the exterior side of
the rear passenger window, the rear passenger window frame of

the door, the passenger side quarter panel, the top of the rear passenger door, and the hood of the vehicle.

76.  Additionally, the report also stated latent prints belonging to JONES also were identified on the hood of the vehicle and on the interior of the rear passenger quarter glass window.

77.  Finally, the report mentioned latent prints from Rontrell Shaw were recovered in two sections of an ammunition box located inside Apartment #2 at the search warrant on August 12, 2021.

**M.   JONES Arrested with a Firearm**

78.  On October 23, 2021, Sergeant E. Campos of the SBPD Homicide Unit informed me that JONES had been arrested the preceding day by the Los Angeles Police Department ("LAPD"), also alerting me JONES was arrested in possession of a firearm.

79.  On October 26, 2021, LAPD Officer A. Paredes, an ATF Task Force Officer, provided me the report documenting JONES's arrest.  The following is a summary of the incident:

a.   On October 22, 2021, the victim of an auto theft contacted the LAPD Pacific Division and stated they were monitoring their stolen vehicle, a 2010 Gold Ford Fusion, via a real time tracking service.  The location was relayed to Officers Maldonado and Martinez who were occupying a marked LAPD unit near the stolen vehicle's location.

b.   The officers spotted the Gold Fusion as it traveled southbound on Lincoln Blvd. from Brooks Ave.  As the vehicle passed the officers' location, the two performed a U-turn

51

and drove up to the rear of the Fusion as it approached California Ave.  As the officers were radioing for an airship and a supervisor, the Fusion pulled into oncoming traffic and drove on the wrong side of the road at a high rate of speed, all prior to the officers initiating their forward-facing emergency lights and siren.  Suspecting the Fusion was aware of the officers' presence and was trying to elude capture, the officers initiated their emergency lights and gave pursuit.

c.   The Fusion continued southbound on Lincoln Blvd., still driving in and towards oncoming traffic as it ran a red light on California Ave. and then again on Palms Blvd.  The Fusion attempted to make a high-speed turn west onto Palms Blvd., but it collided with an occupied black Tesla Model X that was stopped at a red light facing east on Palms Blvd. at the Lincoln Blvd. intersection.

d.   The two officers then watched as an unidentified black female adult sprinted from the driver's side door of the Fusion, taking off and running south until she was out of sight. The officers decided to stick with the vehicle, which had three other occupants inside the passenger compartment.  JONES, seated on the rear driver side seat, was the first to exit the vehicle and was taken into custody by Officer Martinez.  Once JONES was detained and placed into the back of an LAPD unit, Officer Martinez joined his partner Officer Maldonado on the passenger side of the vehicle.

e.   As Officer Martinez approached the passenger compartment, he observed a firearm, later identified as a Sig

Sauer model P239 9mm pistol displaying serial number SA26653, lying in plain view in the floorboard of the right rear passenger seat near J.J.'s[6] feet.  J.J. was removed from the vehicle and taken into custody.  The weapon was found to be loaded with 9mm ammunition, including one round in the chamber.

      f.    The final passenger to exit the vehicle, seated in the front right passenger seat, was J.B.  Officer Martinez had J.B. sit up from his seat.  As he did so, Officer Martinez saw a black firearm, later identified as a Taurus model G3 9mm pistol displaying serial number ABG685171, lying on the front passenger seat, almost as if J.B was sitting on it.  The weapon was found to be loaded with 9mm ammunition including one round in the chamber.  All three suspects were transported to the LAPD Pacific Station for interviews.

      g.    While at the station and following *Miranda*, J.J. agreed to speak with LAPD Det. Gomez.  J.J. stated the Sig Sauer pistol belonged to him and he had purchased the weapon on the street for $700 approximately three weeks prior to his arrest.

      h.    J.B. was the next suspect to be interviewed. Following *Miranda*, J.B. told Det. Gomez that the Taurus pistol did not belong to him.  J.B. stated after the traffic collision occurred, someone may have placed it on his seat.  J.B stated he did not feel whether he had been sitting on the firearm or not.

---

[6] The identities of the subjects involved in the incident are known to law enforcement.  However, for the sake of brevity and to minimize confusion, each subject's initials are used in this affidavit.

J.B stated the firearm could possibly have his fingerprints on it due to his prior manipulation of the weapon inside the vehicle.

       i.    JONES was the final occupant to be interviewed. After being read his *Miranda* warning, JONES stated the Taurus pistol did not belong to him, however advised his fingerprints could be on the firearm.  JONES stated when he entered the vehicle that afternoon, he observed the firearm in the rear dashboard.  He stated during the collision, the Taurus landed beside him.  JONES stated he grabbed it and threw it to the front of the vehicle near the front dashboard but was unsure where it landed.  JONES said he did not know who owned the Taurus.

       j.    All three subjects were booked at the Pacific Jail for possession of a loaded firearm.  JONES was booked on an additional felony no-bail warrant.

### N.    Interstate Commerce

80.  Based on training and experience, including the collective knowledge of other law enforcement officers which has been shared with me, I have learned controlled substances, such as marijuana, travel in and have an effect on interstate and foreign commerce.  Also, after consulting with the Assistant United States Attorney assigned to this investigation, I understand that the Supreme Court has stated that "if the Government proves beyond a reasonable doubt that a robber targeted a marijuana dealer's drugs or illegal proceeds, the Government has proved beyond a reasonable doubt that commerce over which the United States has jurisdiction was affected." *Taylor v. United States*, 136 S. Ct. 2074, 2080-81 (2016).  In

this case, because the robbers targeted a federally controlled substance, the interstate commerce element for a Hobbs Act Robbery is satisfied.

## CONCLUSION

88.   For the reasons described above, there is probable cause to believe that on July 31, 2021, JONES committed violations of 18 U.S.C. §§ 1951(a) (Interference with Commerce by Robbery); 924(c)(1)(A)(iii), (j)(1) (Use, Carry, Brandish, and Discharge a Firearm in Furtherance of a Crime of Violence Causing Death); and 2(a) (Aiding and Abetting).

Attested to by the applicant, ATF
SA Jarrett Keegan, in accordance
with the requirements of Fed. R.
Crim. P. 4.1 by telephone on this
5th  day of November , 2021.

_____
HON. SHERI PYM
UNITED STATES MAGISTRATE JUDGE